**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

DARRELL EWING,

     Petitioner,        Civil No. 2:15-CV-10523
                              HONORABLE DENISE PAGE HOOD
v.                          CHIEF UNITED STATES DISTRICT JUDGE

CONNIE HORTON,[1]

     Respondent.

_____/

## OPINION AND ORDER GRANTING THE
## PETITION FOR A WRIT OF HABEAS CORPUS

Darrell Rashard Ewing, ("Petitioner"), confined at the Chippewa

Correctional Facility in Kincheloe, Michigan, filed a petition for a writ of

habeas corpus pursuant to 28 U.S.C. § 2254, through his attorneys Phillip

D. Comorski and Byron Pitts, challenging his convictions for first-degree

murder, M.C.L. § 750.316, three counts of assault with intent to commit

murder, M.C.L. § 750.83, and possession of a firearm during the

commission of a felony (felony-firearm), M.C.L. § 750.227b.  For the

reasons that follow, the petition for a writ of habeas corpus is GRANTED.

_____

[1]The Court amends the caption to reflect that the proper respondent
in this case is now Connie Horton, petitioner's current warden. *See
Edwards Johns,* 450 F. Supp. 2d 755, 757 (E.D. Mich. 2006); *see also* Rule
2(a), 28 foll. U.S.C. § 2254.

1

# I. Background

Petitioner was convicted following a jury trial in the Wayne County Circuit Court, in which he was jointly tried with his co-defendant Derrico Devon Searcy. This Court recites verbatim the relevant facts relied upon by the Michigan Court of Appeals, which are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1). *See e.g. Wagner v. Smith,* 581 F.3d 410, 413 (6th Cir. 2009):

> These consolidated appeals arise from a shooting at the intersection of Harper and Van Dyke, in the city of Detroit on December 29, 2009. At the time of the shooting, J.B. Watson and his girlfriend, LaRita Thomas, were in Thomas's van along with Phillip Reed and Willie Williams. The van was stopped at the intersection of Harper and Van Dyke in Detroit for a traffic signal. Raymond Love testified that while driving on Harper, a turquoise vehicle turned onto Harper and the two vehicles drove side by side for a short while. Love identified the driver of the turquoise vehicle as Searcy. In that turquoise vehicle, there were also two other black males, one of which was later identified as Ewing. When Love reached the red traffic light at the Van Dyke intersection, the turquoise car pulled to the curb, staying back about six or seven car lengths. Ewing then exited the vehicle with a handgun drawn, approached Thomas's van, and fired many shots into the rear of the van. After shooting, Ewing retreated to the turquoise car, which by that time had moved into the middle of Harper, and the car left in the opposite direction on Harper.
>
> Watson died of injuries he received from the gunshot wounds. Reed was injured in the attack, with a bullet striking him in his left hand. Watson, Reed, and Williams are cousins and members of a gang identified as the Knock Out Boys (KOB). Searcy and Ewing were alleged to be members of a rival gang called the

Hustle Boys.

*People v. Searcy*, No. 301751, 2013 WL 4609125, at *1 (Mich. Ct. App. Aug. 29, 2013).

Petitioner's conviction was affirmed on appeal. *Id.*, *lv. den.* 495 Mich. 935, 843 N.W.2d 200 (2014).

Petitioner seeks a writ of habeas corpus on the following grounds:

I. Petitioner's due process rights were violated when the trial court failed to give the deadlocked jury instruction, thereby depriving petitioner of his federal constitutional rights of due process of law and a fair and impartial verdict, as guaranteed under the Fifth, Sixth and Fourteenth Amendments of the U.S. Constitution.

II. Petitioner was denied a fair trial and impartial jury under the federal constitution where, during jury deliberations, the jurors brought in extraneous information from Facebook and the internet about petitioner Ewing, Mr. Watson, gangs, and gang pecking orders, and the jurors used this information to convict petitioner Ewing.

III. Where Tyree Washington signed an affidavit after trial in which he confessed to the instant offenses, this newly discovered evidence requires that this petition be granted or, at least, that an evidentiary hearing be ordered.

## II.  Standard of Review

28 U.S.C. § 2254(d), as amended by The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), imposes the following standard of

review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
>> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409.  A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11.

### III.  Discussion

The Court will first discuss petitioner's second claim, because this is the claim upon which the Court grants relief.  Petitioner alleges that his due process rights were violated by introduction of extraneous internet evidence brought into jury deliberations by two jurors, which compromised jury deliberations.

The trial court initially addressed the use of internet information prior to trial, when the assistant prosecutor requested to amend her witness list to add Police Officer Terri Graves to testify as an expert or lay opinion witness as to gangs and gang activity.

On October 1, 2010, the trial court held an evidentiary hearing to hear testimony from Police Officer Terri Graves in connection with gang related activity, prior to allowing the prosecutor to add Graves as a witness. (Tr. 10/1/2010, pp. 4-15).  The assistant prosecutor intended to call Officer Graves to testify at trial as an expert witness to give her opinion as to gangs, gang signs, and internet information in connection with gang activity.  The officer provided testimony pertaining to gang signs and then discussed a three page document entitled "The Mini Guide To Gang Signs" which was marked as People's Exhibit 1.  Officer Graves

informed the court that she obtained "The Mini Guide To Gang Signs" from the internet. (*Id.,* p. 18).  Graves then continued to discuss gang hand signs, which she said came from an internet site entitled "Crush Spot"; a social network site similar to Facebook or My Space. (*Id.,* pp. 19-23).  The assistant prosecutor asked Graves if she looked at other social websites to gather gang information.  Graves testified that she looked at other social websites and spent hours gathering gang information on these websites. (*Id.,* pp. 24, 52).

Defense counsel asked Graves where she obtained "The Mini Guide To Gang Signs."  Graves testified she obtained the material from the internet but could not recall the website. (*Id.,* p. 59).  Graves also testified that she utilizes Facebook in her investigations. (*Id.,* pp. 81-82).  The assistant prosecutor concluded the hearing by asking the court to qualify Graves as an expert witness or, at a minimum, qualify her to give lay opinion testimony based on her years of experience and work in the field. (*Id.,* p. 105).

On October 8, 2010, the trial court judge issued an opinion and articulated detailed findings on the record denying the prosecutor's request to add Officer Terri Graves as an expert witness or a lay witness.

The trial court judge denied the proposed trial testimony due to "an overwhelming amount of Officer Graves' 'facts and data,' [that] are based on unreliable principles and methods. Officer Graves' data is based on information that people have told her." The Court proceeded to find her testimony "hearsay within hearsay, within hearsay...not scientific and it is closer to gossip than scientific or reliable data." (Tr. 10/8/2010, pp. 9-10).

Petitioner's trial began on October 25, 2010, continued the following day on the 26th, and then was adjourned on the 27th due to a death in trial counsel's family. The trial resumed, followed by two days of jury deliberations. On November 15, 2010, the jury sent the following note: "We have a question. We have a serious difference of opinion on the verdict that we do not believe we can overcome. Can we declare a hung jury?" (Tr. 11/15/10, p. 3). The trial court judge informed the jury that differences of opinion are bound to occur and sent the jury back for further deliberations. (*Id.*). Trial counsel then advised the court "Well, your Honor, there is, of course, the deadlock jury instruction." The court responded by informing counsel that "[I]t's not time for that yet." Counsel replied to the denial by asking the trial court judge to take the request under advisement. (*Id.*, p. 4). The next day, the jury found petitioner guilty as charged. (Tr.

11/16/10, pp. 7-8).

On January 10, 2011, Juror # 4, Kathleen Frances Byrnes, filed an affidavit informing the court that during deliberations Juror # 13 (Michelle Chesny) brought in Facebook information regarding petitioner's past history and information pertaining to an online eulogy for J.B. Watson. Ms. Byrnes also informed the court that Juror # 5 (Karen James) had googled gang information and brought up information pertaining to gang codes and gang activity that she found on the internet. This Court notes that the jurors brought into jury deliberations the same type of information that the trial court excluded prior to petitioner's trial.

Petitioner filed a motion for a new trial, premised on the affidavit of Ms. Byrnes, claiming that the extraneous information entered the jury deliberations, tainting the jury. (Tr. 4/8/2011, p. 3). The assistant prosecutor argued against the motion for a new trial, but conceded the need of an evidentiary hearing. (*Id.,* p. 9). The trial court judge denied the motion for a new trial and denied an evidentiary hearing, finding that the jury was not exposed to any extraneous evidence that was not already presented during petitioner's trial. (*Id.,* p. 13). The trial court judge denied petitioner's motion, as follows:

The defendant has not provided sufficient evidence that the jury was exposed to any extraneous information at all that was not already presented to it as evidence in the trial itself by all the various witnesses, and that they couldn't see by just by looking in the back of the room and entering and exiting for lunch and breaks and everything.

(*Id.*).

This Court initially finds that the trial court committed error by denying petitioner an evidentiary hearing pertaining to jury bias. Denial of a hearing pertaining to extraneous information that taints the jury constitutes constitutional error as follows:

[I]t is a matter of clearly established Supreme Court precedent that a criminal defendant claiming implied juror bias is entitled to the opportunity to prove actual bias. *See Dennis v. United States*, 339 U.S. 162, 171-72, 70 S.Ct. 519, 94 L.Ed. 734 (1950) ("Preservation of the opportunity to prove actual bias is a guarantee of a defendant's right to an impartial jury."). When a trial court is presented with evidence that an extrinsic influence has reached the jury which has a reasonable potential for tainting that jury, due process requires that the trial court take steps to determine what the effect of such extraneous information actually was on that jury. In *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982), the Supreme Court made it clear that, while no court has the ability to shield jurors from every outside contact or influence that might affect their votes, nonetheless, the trial court has a duty to take steps to ensure that the jury votes solely on the basis of the evidence presented at trial. "Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Id.* at 217, 102 S.Ct. 940. The Court went on to hold that a post-trial hearing is sufficient to

> decide juror partiality in both the state and federal courts, and
> that in a federal habeas proceeding, the factual finding made by
> the state trial court in such a hearing is entitled to the
> presumption of correctness. *Id.* at 218, 102 S.Ct. 940.

*Nevers v. Killinger*, 169 F.3d 352, 373 (6th Cir. 1999); *abrogated on other grds by Harris v. Stovall*, 212 F.3d 940 (6th Cir. 2000).

As in *Nevers*, petitioner indicates that he was denied his right to due process when the trial court similarly accepted the affidavit, denied the request for an evidentiary hearing, made no attempts to determine the effect of that information on the jury's verdict, and then unilaterally found the error to be harmless. As in *Nevers*, the Michigan courts failed to accord petitioner "his due process rights to have a factual determination made regarding the effect of the extraneous information on the jury's deliberations, proceeding instead [to determine] that the jury's possession of the extraneous material was harmless beyond a reasonable doubt when weighted against the evidence of [] guilt." *Nevers*, 169 F.3d at 374.

The Sixth Circuit in *Nevers* found that refusal to permit any opportunity to establish jury bias resulted in a decision contrary to established law. *Nevers,* 169 F.3d at 373-74. By asking for and being denied an evidentiary hearing on his claim of jury bias, petitioner "was effectively prevented from demonstrating with specificity that the

10

extraneous information the jury possessed did in fact impair the ability of the jury to decide the case solely on the evidence properly presented to them through the mechanism of the trial." *Id.*

Because petitioner preserved his juror misconduct claim for appeal by filing a motion for a new trial,[2] the Michigan Court of Appeal's applied an abuse of discretion standard in reviewing petitioner's juror misconduct claim, as follows:

> In order to establish that the extrinsic influence was error requiring reversal, the defendant must initially prove two points. First, the defendant must prove that the jury was exposed to extraneous influences. Second, the defendant must establish that these extraneous influences created a real and substantial possibility that they could have affected the jury's verdict. Generally, in proving this second point, the defendant will demonstrate that the extraneous influence is substantially related to a material aspect of the case and that there is a direct connection between the extrinsic material and the adverse verdict.

*People v. Searcy*, 2013 WL 4609125, at *8 (citing to *People v. Budzyn*, 456 Mich. 77, 88–89; 566 N.W.2d (1997)(internal citations omitted)).

The affidavit of Kathleen Francis Byrnes states that "contrary to her

---

[2]Petitioner also filed for an evidentiary hearing and new trial based on the affidavit of Tyree Washington which stated that Washington "commited [sic] the murder of J.B. Watson" and that defendants Searcy and Ewing were "wrongfully charged." *People v. Searcy*, 2013 WL 4609125, at *10. This Court takes note that Washington (MDOC # 659391) has a early release date of 4/14/2019 and maximum discharge date of 3/14/2037.

indication to the trial court, her vote to convict 'was not [her] honest verdict.'" Byrnes alleged, in relevant part, that she was pressured into agreeing with the verdicts and that other jurors engaged in internet research regarding Watson, Ewing, Searcy, and gangs." *People v. Searcy*, 2013 WL 4609125, at *5.

Petitioner has shown that the jury was exposed to extraneous information. Petitioner must next demonstrate that the extraneous information created a real and substantial possibility that the jury could have been influenced to the point of effecting the jury's verdict.

The Michigan Court of Appeals found that the external internet research conducted by the two jurors and presented during jury deliberations constituted extraneous facts or information. *People v. Searcy*, 2013 WL 4609125, *9 (citing *Budzyn*, 456 Mich. at 89). The Michigan Court of Appeals concluded, however, that the admission of the internet evidence was harmless:

> The Facebook information obtained by juror Michelle Chesney included a photograph of Ewing with a female and a eulogy for Watson. The photograph is merely duplicative, as numerous photographs of Ewing and Searcy were admitted into evidence that were also obtained from social networking websites. The photograph is relatively innocuous as it depicts Ewing with a female but is not suggestive of any improper or illegal conduct. As such, the photograph constitutes harmless error. Similarly, the

eulogy simply provides repetitive information verifying Watson's death. Ewing cannot demonstrate that the eulogy "is substantially related to a material aspect of the case and that there is a direct connection between the extrinsic material and the adverse verdict." Further, Byrnes only notes that Chesney "brought to the juror's [sic] attention that she had read an [sic] eulogy online for J.B. Watson." In making this statement, Byrnes only implies that Chesney read the online eulogy and that, other than its existence, the eulogy was not discussed in any significant detail. As stated by our Supreme Court in reviewing affidavits of this type, the focus is not on "their subjective content," but rather on "the extent to which the jurors saw or discussed the extrinsic evidence." There is no suggestion in the affidavit that the eulogy comprised a topic of significant discourse amongst the jurors.

Byrnes also avers that a juror, Karen James, procured information on "gang codes and that gang activity involved killing people." During deliberations, James allegedly indicated "that gangs have a pecking order" based on the Internet information she obtained and went on to opine regarding the status of Ewing and Washington in terms of their gang membership. At the outset, there was considerable testimony from witnesses indicating Ewing's and Washington's membership or affiliation with various gangs. It was also fairly obvious, based on the testimony and evidence elicited at trial, that the prosecutor's theory was that this murder was gang related. Hence, James's revelation that "gang activity involved killing people" is neither novel nor outside the purview of a reasonable inference based on the admissible evidence. James's assertion that she had obtained information on "gang codes" over the Internet does not indicate that the codes were shared or discussed in any detail with other members of the jury and cannot serve to demonstrate a necessity for reversal. James also allegedly learned through her Internet research "that gangs have a pecking order." This information is duplicative of an inference to be drawn from Christopher Richardson's testimony, in which he opined that Washington's assertions that he was the perpetrator amounted to "bragging" and an attempt to prove himself. Richardson also

characterized Washington as a "flunky," intimating a hierarchical relationship in gang membership. Hence, any error would be harmless because the information regarding gang structure was duplicative and Ewing failed to demonstrate that the information "is substantially related to a material aspect of the case and that there is a direct connection between the extrinsic material and the adverse verdict."

*People v. Searcy*, 2013 WL 4609125, at *9 (internal citations omitted).

In reviewing the determinations made by the Michigan Court of Appeals, this Court has serious doubts that the jurors did not discuss the internet research that was brought into jury deliberations by the two jurors. The Michigan Court of Appeals states:

Byrnes only notes that Chesney "brought to the juror's [sic] attention that she had read an [sic] eulogy online for J.B. Watson." In making this statement, Byrnes only implies that Chesney read the online eulogy and that, other than its existence, the eulogy was not discussed in any significant detail.

*People v. Searcy*, 2013 WL 4609125, at *9.

Ms. Byrnes' affidavit is void of information pertaining to the extent of the discussions regarding the eulogy. Considering the fact that the jury sent a note the day before stating that it was deadlocked with a serious difference of opinion, this Court could infer that each piece of extraneous evidence brought in by Juror # 13 and Juror # 5 was discussed prior to reaching a guilty verdict the following day. The extent of the discussion is

14

unknown due to the trial court's denial of an evidentiary hearing pertaining

to the extraneous information and its effect on the verdict.

The Michigan Court of Appeals findings regarding extraneous

information pertaining to "gang codes" as follows is also unsupported by

the record.

> James's assertion that she had obtained information on "gang
> codes" over the Internet does not indicate that the codes were
> shared or discussed in any detail with other members of the jury
> and cannot serve to demonstrate a necessity for reversal.

*People v. Searcy*, 2013 WL 4609125, at *9.

Considering the serious difference of opinion of the jurors, brought to

the court's attention the day before, such a finding by the Michigan Court

of Appeals is unreasonable.  It would appear more likely than not, that the

additional information, pertaining to gang codes, may have been

discussed in order to break the jury deadlock.

The Michigan Court of Appeals further believed that the discussion

of the "gang pecking order" was merely duplicative of testimony pertaining

to Washington's involvement in the murder as an attempt to "prove

himself" by taking the blame:

> James also allegedly learned through her Internet research "that
> gangs have a pecking order." This information is duplicative of an
> inference to be drawn from Christopher Richardson's testimony,

in which he opined that Washington's assertions that he was the perpetrator amounted to "bragging" and an attempt to prove himself. Richardson also characterized Washington as a "flunky," intimating a hierarchical relationship in gang membership.

*People v. Searcy*, 2013 WL 4609125, at *9.

The Michigan Court of Appeals fails to cite the remaining portion of the affidavit pertaining to this issue. Section 7 of Byrnes's affidavit reads as follows:

Ms. James also said during deliberations that gangs have a pecking order according to information she googled at home. She went on to say that Darrell Ewing was at the top of the pecking order. That would put Tyree Washington at the bottom and the gang decided to sacrifice Tyree Washington by setting him up as the fall guy for the murder. According to Ms. James, the above information was based on what she had read on line regarding the history of gangs on the google web site.

See Affidavit of Kathleen Frances Byrnes (ECF # 5-27, Pg IDS 2996-98).

A review of Ms. Byrnes' affidavit indicates that a significant amount of internet research and information entered the jury deliberations, which was discussed, potentially ending the jury deadlock and resulting in a guilty verdict. The detailed pecking order information pertaining to petitioner being at the top of the hierarchy and Washington at the bottom was deduced by one juror after her research on gangs. It was then brought into the jury deliberations and discussed with the other jurors.

The details of the information itself and the source of this information are unknown.  Without an evidentiary hearing, the specifics of this information, and the extent of other extraneous information, is unknown.

After reviewing the record, Petitioner has shown that the internet information may have tainted the jury.  After two days of deliberations the jury asked the trial court to "declare a hung jury" because the jury had "**a serious difference of opinion on the verdict that we do not believe we can overcome**." (Emphasis added).  The judge told the jurors to go back and try to reach a verdict.  Following further discussion, the jury reached a guilty verdict the next day.

This Court cannot conclude that the jurors' use of extraneous information was harmless error.  Lengthy deliberations by a jury preceding the jury misconduct and a relatively quick verdict following the misconduct strongly suggests prejudice. *See Sassounian v. Roe*, 230 F.3d 1097, 1110 (9th Cir. 2000), *as amended on denial of reh'g* (Dec. 6, 2000); *see also United States v. Perkins*, 748 F.2d 1519, 1534 (11th Cir. 1984)(Convicted defendant was entitled to new trial on grounds of juror misconduct, where one juror had injected extrinsic evidence into deadlocked jury's deliberations involving his knowledge of defendant and disputing

defendant's testimony).  A jury's difficulty in reaching a verdict, evidenced

by the length of deliberations and the jury's indication to the trial judge that

it was deadlocked provides a "powerful indication" that the trial error was

not harmless. *See e.g. Eddleman v. McKee*, 471 F.3d 576, 587 (6th Cir.

2006); *overruled on other grds by Fry v. Pliler,* 551 U.S. 112 (2007); *see*

*also Ayers v. Hudson*, 623 F.3d 301, 317, n.12 (6th Cir. 2010)

("Additionally, we note that in light of the initial deadlock by the jury, it

would have been problematic for the State to assert that the constitutional

error was harmless beyond a reasonable doubt.").

A jury deadlock indicates that the evidence of guilt was not so

overwhelming. *See United States v. Harber*, 53 F.3d 236, 243 (9th Cir.

1995)(Defendant was entitled to new trial for introduction of case agent's

report into jury deliberations; defendant demonstrated that case agent's

report, which contained summary of his investigation of defendant and his

opinion that defendant was guilty, was presented to jury, government

conceded that jurors read report, report was inherently prejudicial, jury

was deadlocked at one point which demonstrated that evidence of guilt

was not so overwhelming that jury would have returned guilty verdict

absent report, and report, which contained evidence not introduced at trial

which could have affected deliberations, could not be considered harmless as duplicative). The jury deadlock in petitioner's case was due to "a serious difference of opinion on the verdict" that they believed they could not overcome. (Tr. 11/15/2010, p. 3). Following consideration of the extraneous internet information, the jury returned a guilty verdict the next day. Consideration of this extraneous evidence cannot be considered harmless or duplicative.

Based on U.S. Supreme Court precedence, when "a conscientious judge is in grave doubt as to the harmlessness of the error, the petitioner must win." *O'Neal v. McAninch*, 513 U.S. 432, 436, 437 (1995). The focus in such a situation is not merely whether there is enough evidence to support the result, apart from the portion affected by the error; it is, whether the error itself has substantial influence. If a judge is left in grave doubt, the conviction cannot stand. "Only if a federal habeas court can say with certainty that a trial error had little or no impact on the judgment, should the judgment stand." *See Barker v. Yukins*, 199 F.3d 867, 874 (6th Cir. 1999).

The evidence brought into jury deliberations by Juror # 13 and Juror # 5 was similar to the hearsay evidence that the prosecution sought to

admit through the testimony of Officer Terri Graves.  The extent of this information is unknown, due to the trial court judge's denial of an evidentiary hearing.  The effect of the extraneous information on the jury does not appear to be harmless, in light of the jury rendering a guilty verdict the following day, after being deadlocked.

Because this Court finds that the trial court's determination that the extraneous information did not taint the jury deliberations was contrary to clearly established federal law as determined by the Supreme Court, the Court GRANTS relief on petitioner's second claim pertaining to the denial of a right to a fair trial and impartial jury.  Determination that petitioner is entitled to a writ of habeas corpus with respect to his second claim renders "moot" petitioner's first and third claims.

## IV. Order

IT IS ORDERED that Petitioner Darrell Rashard Ewing's petition for a writ of habeas corpus [Dkt. # 1] is CONDITIONALLY GRANTED. UNLESS THE STATE TAKES ACTION TO AFFORD PETITIONER A NEW TRIAL WITHIN NINETY (90) DAYS OF EITHER THE DATE OF THIS OPINION *OR* THE DATE WHEN ANY APPELLATE REVIEW BECOMES FINAL, WHICHEVER DATE IS LATER, RESPONDENT IS

ORDERED TO RELEASE PETITIONER FROM CUSTODY FORTHWITH.

S/Denise Page Hood
Denise Page Hood
Chief Judge, United States District Court

Dated: November 20, 2017

I hereby certify that a copy of the foregoing document was served upon counsel of record on November 20, 2017, by electronic and/or ordinary mail.

S/LaShawn R. Saulsberry
Case Manager